IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

MOHAMMAD ALI, as Trustee for the
Pete's Mountain Life Insurance Trust,

             Plaintiff,

                                  3:10-cv-00943-PK

                                  FINDINGS AND
                                  RECOMMENDATION

v.

MIDLAND NATIONAL LIFE
INSURANCE COMPANY, an Iowa
corporation

             Defendant.

_____

PAPAK, Judge:

       Plaintiff Mohammad Ali, trustee for Pete's Mountain Life Insurance Trust ("the Trust"),

brings this suit for breach of contract and declaratory relief arising out of Defendant Midland

National Life Insurance Co.'s ("Midland") allegedly improper cancellation of the Trust's term life

insurance policy.  Now before the court is Midland's motion for summary judgment (#95) and

the Trust's informal motion for summary judgment under Fed. R. Civ. P. 56(f) contained in its

response brief (#108).   For the reasons stated below, both Midland's motion for summary

judgment and the Trust's motion for summary judgment should be denied.

//

//

## BACKGROUND

This case involves the effect of an insurer's cancellation of a life insurance policy for non-payment of premiums after the insurer continued sending premium due notices to the insured's last known address, despite learning that the address was invalid. Plaintiff is the trustee of Pete's Mountain Life Insurance Trust, an Oregon life insurance trust created by Sohail Masood for the benefit of his two sons. Effective December 28, 1999, Midland issued a $2 million life insurance policy, Number 1502349951 ("the Policy"), with Masood as both the insured and the owner of the Policy.[1] (Amended Answer, #37, at 4-5); (Newman Decl., #101, Ex. C.) The Policy provided that a premium of $3,980 was due annually for the first 20 years. (Newman Decl., #101, Ex. C at 1.) The Trust applied for the Policy through Andrew Morrow, an independent insurance agent who sold Midland policies. (Morrow Decl., #105, at 2-3.) The Policy application listed 25144 SW Pete's Mountain Road, West Linn, OR 97068 – Masood's residence– as the address for the policy. (D.'s Br., #96, at 2); (Axelrod Decl., #109, at 2-3.) Morrow told Masood that Midland would mail a premium due notice in advance of the payment deadline annually and, upon receipt, Masood would be obligated to pay the premium. (Morrow Decl., #105, pp 6). The Policy itself makes no mention of premium due notices, providing only that each premium is to be paid "by its due date" and to Midland at its home office or through an authorized agent. (Newman Decl., #101, Ex. C, at 4-5.)

For the next several years, Midland sent premium due notices to the Trust at 25144 SW Pete's Mountain Road and the Trust paid the annual premiums in a timely manner. (D.'s Br., #96, at 3.) Then, on January 14, 2004, Midland processed a request from the Trust – likely by

---

[1] Midland later reissued the Policy to reflect that the Trust was the owner of the Policy, after the Trust's attorney Virginia Ross corresponded with Midland concerning the error. (Ross Decl., #106, at 5-6.)

phone– to change the Policy's mailing address from 25144 SW Pete's Mountain Road to P.O.

Box 668, West Linn, OR 97068.  (Lynch Decl., #97, Ex. 5, at 10) (Ruckelshausen Dep., at 39:3-

20.)  Midland subsequently sent mail for the Policy to P.O. Box 668, including premium due

notices for the years 2004 through 2009.  (Amended Answer, #37, at 8.)  Again, the Trust paid

those notices in a timely manner.

   In late June 2009, the Trust contends that it notified Midland by writing that it had

changed its address again, from P.O. Box 668 to P.O. Box 121.  The trust relies on a letter dated

June 22, 2009 bearing the return address of the Trust in the top right corner, the designation "Via

Standard Mail" above an address for Midland, and the signature line of Mohammad Ali, trustee

of the Trust.  *Id.*  Ali testified that the letter was "probably prepared by Travis [Shafer],"

Masood's administrative secretary.[2]  (Lynch Decl., #97, Ex. 3, at 44-45, 47-48) (Ali Dep., at

44:20 - 45:8, 47:20 - 48:3).  Ali signed the letter.  (Ali Decl., #118, ¶3); (Ali Dep., at 53:19-25);

(Shafer Dep., at 82:18-20).

   In any case, there is no indication that Midland received, processed, or acted upon

the Trust's purported June 2009 change of address correspondence.  Despite that the change of

---

  [2] Shafer, however, did not remember preparing the letter.  (Suppl. Lynch Decl., #112, Ex. 10) (Shafer Dep., at 80:19-21, 82:21- 83:8.)  He testified that the letter was not on his standard letterhead format, which places the Trust's return address in the center of the header, not in the upper right corner.  *Id.* at 80:19-21, 84:11.  Shafer also noted that the address for Midland in the letter used the city designation "Sioux City, South Dakota," while previous letters he had prepared to Midland listed its address in "Sioux Falls, South Dakota."  *Id.* at 81:20 - 82:11. Shafer observed that letters he had previously prepared to Midland utilized both facsimile and standard mail, or facsimile and certified mail, while this letter indicated it was sent only by standard mail.  *Id.* at 84:12-20.

  Ali declares that either he or Shafer would have taken the letter to the post office to be mailed on the day it was signed, or the day after, according to their practice with various Trust matters.  (Ali Decl., #118, ¶4.)  Shafer, however, did not remember mailing the letter, but he testified that if Ali had given him a letter to mail, he would have mailed it.  (Shafer Dep., at 80:19-21, 82:21- 83:8.)

address letter was addressed to "Sioux City, South Dakota," a non-existent city, the Trust's postal

expert Dennis Cramer opines that, assuming the letter was mailed, there is a 98.2 percent chance

the Postal Service would have correctly coded and delivered the letter to Midland because it bore

the correct zip code. (Cramer Decl., #103, at 12.)

Nearly six months later, on December 8, 2009, Midland sent the Trust a premium due

notice for the 2010 policy year starting December 28, 2009, at P.O. Box 668.   The Postal Service

marked the notice "UNDELIVERABLE AS ADDRESSED UNABLE TO FORWARD" and

returned it to Midland on December 23, 2009. (Newman Decl., #101, Ex. K.) The Trust failed

to make its premium payment by December 28, 2009 when it was due, or by January 29, 2010,

the end of the 31 day grace period provided by the Policy. (Lynch Decl., #93, Ex. 6, at 25-26)

(Pl.'s Resp. to Request for Admissions Nos. 3,4.) Yet the Trust appeared prepared to pay the

premium around that time, depositing the exact annual premium amount, $3,980, into a bank

account on December 30, 2009. (Newman Decl., #101, Ex. J, at 1.)

On February 1, 2010, Midland sent a second notice to the Trust, again at P.O. Box 668,

indicating that the Policy had lapsed, but that Midland would reinstate the policy if the premium

was received by February 17, 2010. (Newman Decl., #101, Ex. L, at 1.)  That letter included the

symbol "*$*" under the address for the Trust, which Midland uses as an internal designation

indicating that mail had previously been returned from that address. (Newman Decl., #101, Ex.

G, at 4) (Ourada Dep., at 16:18-21.)   The February 1, 2010 mailing was also returned as

undeliverable. (Amended Answer, #37, p13.)

Finally, on March 10, 2010, Midland mailed a third letter to the Trust at P.O. Box 668

indicating that the Policy had lapsed and encouraging the Trust to apply for reinstatement.

(Newman Decl., #101, Ex. M.) That letter was also returned as undeliverable. (Amended

Answer, #37, p13.)  Besides sending these three letters to the P.O. Box 668, Midland made no

other attempts to notify the Trust that Midland had not received Trust's the annual premium.

As a matter of policy, if Midland received a premium notice returned as undeliverable,

Midland would send notice to the Midland insurance agent who sold the policy as long as he or

she was still active, as well as to any secondary addressee designated on the policy, but would not

seek other means to contact a policyholder.  (Lynch Decl., #93, Ex. 9, at 6) (Helms Dep., at

23:24-26:2).  Additionally, Midland conducted a monthly "wash" of its policyholder addresses to

attempt to keep those addresses current.  *Id.* at 23:1-13.

The Trust's insurance expert John Lenz, however, opined that it is also standard

insurance industry practice for an insurer to notify the agent who wrote the policy or the Regional

Sales Director when a policy enters into a grace period or lapses, so the agent or the Regional

Sales Director can determine whether the insured intended to let the policy lapse, and if not,

rescue the policy.  (Lenz Decl., #104, at 7-10.)  Lenz also stated that if the insurer has terminated

the selling agent, the Regional Director may still notify the agent that the policy may lapse, both

to warn the insured and as a professional courtesy to the agent, who may receive a renewal

commission each time the policy premium is paid despite that the agent has been terminated by

the insurer.  *Id.*

Sometime in March 2010, Ali became aware of the fact that the Trust had not received a

premium due notice.  (Lynch Decl., #97, Ex. 3, at 56) (Ali Dep., at 56:20-25.)  Masood then

contacted Morrow, the insurance agent who sold the policy.  But because Midland had previously

terminated Morrow, Midland did not inform him that the Trust's policy had lapsed.  *Id.*, Ex. 3 at

58; (Morrow Decl., #105, at 7.)  On March 22, 2009, Masood sent a letter to Midland tendering

payment from the Trust of the 2010 premium and voicing concern that Midland had not

processed the Trust's change of address notification. (Newman Decl., #101, Ex. O.) Midland

forwarded Masood copies of the February 1, 2010 and March 10, 2010 letters describing that the

Policy had been cancelled and refused to accept the Trust's tender of the premium payment.

(Newman Decl., #101, p16, Ex. O); (Newman Decl., #101, Ex. F, at 10-11) (Helms Dep., at

31:19-32:9.)

Masood also called Midland and disclosed that he had a heart condition, although it is

unclear whether he made this call before or after Midland refused the Trust's tender of premium

payment. (Newman Decl., #101, Ex. A, at 9) (Masood Dep., 82:12-14.) The Trust never applied

for reinstatement, which would have required that Masood remained insurable. (Newmand

Decl., #101, Ex. A, at 58, Ex. C, at 5.) At the time, Masood was under medical care for his heart

condition, and it was clear to Ali, the trustee, that Masood would not be insurable. (Ali Dep., at

58:11-14.) Lenz also opines that Masood could no longer have obtained life insurance from any

carrier based on his medical condition– ongoing angina and coronary artery disease requiring

likely additional heart surgery. (Lenz Decl., #104, at 4,6.)

Subsequently, the Trust filed suit, alleging claims for breach of contract seeking specific

performance or damages, and a claim seeking a declaratory judgment that the insurance contract

is still in effect. (Notice of Removal, #1, Ex. B.) Included in the breach of contract claims is the

allegation that Midland breached the contract's "express and statutorily-implied terms and its

implied covenant of good faith and fair dealing . . . ." *Id.* at 24, 27.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## DISCUSSION

Midland's motion for summary judgment asserts that the Trust's claims fail because: (1)

the Trust breached the express terms of the contract by failing to pay the annual premium in the

required time; and (2) Midland has no duty– whether from an express or implied term, or from

the implied duty of good faith and fair dealing– to send the Trust premium due notices at all, to

send premium due notices to the new P.O. box of which it had no knowledge, or to make other

attempts to contact the Trust. The Trust responds that because Midland regularly sent premium

due notices, Midland was estopped from cancelling the policy until the Trust actually received

such a notice. Moreover, the Trust argues that factual issues remain concerning whether Midland

breached the implied duty of good faith and fair dealing by improperly refusing the premium

payment tendered six weeks after the due date and by failing to make any additional efforts to

notify the Trust of the impending policy lapse beyond sending three notices to a known invalid

address.

As a threshold matter, I note that Midland conceded at oral argument that its practice of

sending premium due notices to demand payment created an implied contractual obligation to

continue sending those notices before terminating the Policy for lack of payment.[3]  That

concession, however, does not resolve the pending motions.  The court must determine whether a

factual dispute remains concerning:  (1) whether Midland breached that judicially-implied

contract requirement to send premium due notices by mailing those notices to an invalid P.O.

box; and (2) whether Midland's conduct otherwise breached the implied duty of good faith and

fair dealing.  I find that a jury must resolve both these questions by determining whether the

Trust sent Midland a change of address notification, and if so, whether Midland properly acted

upon it.

## I.    Effect of Sending Notice to Invalid Address

Trust argues that once Midland established a custom of sending premium due notices,

Midland's obligation was to ensure that the notices were "actually received," citing *Pester v. Am.*

*Family Mut. Ins. Co.*, 186 N.W.2d 711, 714 (Neb. 1971).  Relying on *Pester*, the Trust contends

that Midland is now estopped from arguing that the policy lapsed due to nonpayment, even if the

Trust cannot establish that it properly notified Midland of its change of address.  I disagree.

Although no Oregon court has ever addressed this issue, other authority indicates that estoppel

prevents the insurer from asserting a policy lapse only when the insured fails to receive a bill

*through no fault of his own.*

In *Prester*, the insurance contract did not require the insurer to provide notice of the date

and amount of premiums due, but the insurer did so anyway for many years.  186 N.W.2d at 713.

Consequently, the insurer waived its right "to require the plaintiffs to ascertain the premium-due

---

[3] Even if Midland had not made that concession, I would have reached that same
conclusion, since an insurer's "practice" or "custom" of sending premium due notices creates a
requirement to continue providing these notices before cancelling a policy for non-payment.  *See*
3 Couch on Insurance § 71:7 (3rd ed., rev. 2012) (collecting cases); 6 Appleman on Insurance §.
40:20 (2nd ed., rev. 2012) (same).

dates and make payments without any notice or demand from defendant." *Id.* At one point, however, the insurer "inadvertently" failed to adhere to its prior practice of sending a premium due notice and the insured also failed to submit timely payment. *Id.* at 714. The Court therefore determined that the policy lapsed "through no fault of the plaintiffs who are ready and able to pay and desirous of doing so" and held that the insurer was estopped from asserting a lapse of the policy for non-payment.[4] *Id.* at 714. Thus, *Prester* stands for the proposition that an insurer's unilateral failure to adhere to its custom of sending premium due notices prevents it from thereafter terminating a policy for non-payment.

Leading insurance law treatises also recognize the converse principal– that an insurer is not estopped from asserting a lapse when the insured is at fault for his own failure to receive the premium due notice. If an insured is required to send premium due notices by custom, the insurer "must continue to send notices to the address it has on file for the insured unless it is notified that the insured has changed address." 5 Couch on Insurance, §71:34 (3rd ed., rev. 2012) . However, "[t]he fact that the insured has changed his or her address does not affect the sufficiency of the notification, *where the change is unknown to the insurer*." *Id.* (citing *Lothrop v. Greenfield Stock & Mut. Fire Ins. Co.*, 84 Mass. 82 (1861)) (emphasis added); *see also* 6 Appleman on Insurance § 40.10 (2nd ed., rev. 2012) ("if the insured fails to notify the insurer of a change of address, a notice to the old address suffices").

Thus, assuming Oregon courts followed *Prester* and these leading treatises, Midland's compliance with the judicially-implied contract requirement to send premium notices before

---

[4] The Court concluded: "We are prone to agree with the statement found in 43 Am.Jur.2d, Insurance, s. 1143, p. 1067, which is as follows: 'Where a custom of giving notice of the due date of premiums has been definitely established, the insured has a right to rely on such notice, and in the absence thereof, a policy may not be terminated or forfeited for nonpayment of premiums without notice to the insured that the custom has been abandoned.'" *Id.* at 714.

cancelling the policy depends crucially on whether the Trust or Midland is at fault for the Trust's

failure to receive the premium due notice. In this regard, the court considers three categories of

evidence: (1) the existence of a copy of the June 2009 change of address letter in the Trust's

files[5]; (2) the testimony of Ali (the trustee) and Shafer (Masood's secretary) that one of them

would have mailed the letter soon after it was prepared; and (3) the testimony of expert Dennis

Cramer that, if the letter was sent, it would have most likely been received by Midland even

despite listing the incorrect city. In combination, this evidence creates a question of fact

regarding whether the Trust properly notified Midland of its new address, and in turn, whether

---

[5] Midland contends that the Trust's June 2009 change of address letter is not properly authenticated and is inadmissible hearsay. Federal Rule of Evidence 901 provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). To properly authenticate documents submitted in conjunction with summary judgment proceedings, the documents must be "attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56(e)(4) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002) (internal quotations omitted). For a witness to effectively authenticate a document through a declaration, "the authenticating witness must have personal knowledge that the document is what it purports to be, e.g., because he wrote it, signed it, used it, or saw others do so." *Salkin v. United Servs. Auto. Ass'n*, 835 F. Supp. 2d 825, 828 (C.D. Cal. 2011) (citing *Orr*, 285 F.3d at 774 n. 8.) Here, the deposition and supplemental declaration of Mohammed Ali, the trustee, suffice to authenticate the letter. Ali both testifies and declares that the letter bears his signature. He also declares that he signed the letter on June 22, 2009, the day the letter is dated, or immediately thereafter. (Ali Decl., #118, ¶3.) The letter is therefore adequately authenticated by Ali, a person who signed it. *See Orr*, 285 F.3d at 774 n. 8.

Additionally, the letter is not inadmissible hearsay. Midland contends that the letter is an out-of-court statement "offered to prove the truth of the matter asserted by Plaintiff (that Midland received and failed to process this change of address request for the policy) . . . ." (D.'s Reply, #111, at 5.) Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). As Rule 801 makes clear, the "matter asserted" refers to the matter asserted in the hearsay "statement," not in the current litigation, as Midland suggests. The matter asserted in the change of address letter is simply that the Trust has changed its address from P.O. Box 668 to P.O. Box 121. The Trust does not offer the letter here as proof that it changed its address, but rather, as proof that it *notified* Midland that it changed its address. A common non-hearsay use of a statement is to demonstrate its effect on the listener or recipient, particularly in providing notice. The letter is offered for this purpose.

Midland properly responded to that change of address request.

## II.    Implied Duty of Good Faith and Fair Dealing

In addition to the judicially-implied requirement to send premium due notices, the Trust also relies on the implied duty of good faith and fair dealing for its breach of contract claims. The Trust primarily argues that Midland breached the duty of good faith and fair dealing by failing to seek out another means of contacting the Trust after Midland became aware that the Trust's address on file was no longer valid.  But, as the court mentioned during oral argument, Midland's alleged failure to act on the Trust's change of address request could also potentially be considered a breach of the duty of good faith and fair dealing.  After setting forth the legal standard concerning the duty of good faith and fair dealing, I address both arguable bases for a breach of that duty and find that only the alternative theory raised by the court should advance to a jury.

Every contract automatically includes an implied covenant of good faith and fair dealing. *Zygar v. Johnson*, 169 Or.App. 638, 645, 10 P.3d 326 (2000).  Although Oregon courts offer no exhaustive definition of good faith, they apply the good faith doctrine "to effectuate the reasonable contractual expectations of the parties." *Best v. U. S. National Bank*, 303 Or. 557, 563, 739 P.2d 554 (1987).  Thus, "[w]hen one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith." *Id.* However, only the parties' "*objectively* reasonable expectations" will be considered. *Uptown Heights Associates v. Seafirst Corp.*, 320 Or. 638, 645, 891 P.2d 639 (1995) (emphasis added).

The Oregon Court of Appeals recently illustrated the application of the implied duty of

good faith and fair dealing in *Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 159 P.3d 384 (2007). There, plaintiff took out a fire insurance policy which provided, in part, that the insurer could elect not to renew the policy by giving written notice to the insured at his mailing address shown in the policy declarations at least 30 days before the expiration of the policy. *Id.* at 652-653. Plaintiff presented evidence that it provided the insurer with a change of address request when renewing the policy, but the insurer failed to process that request and later sent notices for renewal of the policy to plaintiff's old address, which were returned undeliverable. *Id.* at 656. The plaintiff never received a notice of cancellation at the current address and the policy expired without being renewed. *Id.* In *Morrow*, the insurer conceded that the duty of good faith and fair dealing implied in the contract encompassed a duty to process an address change request, assuming that the request was properly made and did not contradict the express terms of the policy. *Id.* at 662. ("the implied covenant of good faith and fair dealing does not vary the substantive terms of the contract or impose obligations inconsistent with the terms of the contract"). The Court then agreed with the insurer's concession, observing: "it is within the parties' reasonable expectations that, if the insured provides a change of address, the insurer will take action on that request . . . ." *Id.* at 662. The Court ultimately recognized that because questions of fact remained concerning whether the insurer received the plaintiff's change of address request and whether the request was in the proper format, summary judgment should have been denied on plaintiff's breach of contract claim based on the implied duty of good faith and fair dealing.

The holding of *Morrow* is directly applicable to the Trust's first duty of good faith and fair dealing argument. As in *Morrow*, the parties' objectively reasonable expectations under the insurance policy required Midland to take action on an insured's properly submitted change of

address request.  Admittedly, the policy language here did not ever require Midland to mail notices of any kind to the Trust, as in *Morrow*.  But, as explained above, Midland's custom of sending premium due notices created such an obligation.  To effectuate that obligation, Midland must also have been bound to act on an insured's change of address request.  Concluding otherwise would mean that an insured who moves addresses necessarily forfeits his right to continue receiving premium due notices, even if he informs Midland of his new address. Because there is a factual dispute concerning whether the June 2009 change of address letter was mailed by the Trust and received by Midland, the jury must determine whether the request to change addresses was properly submitted to Midland, and if so, whether Midland acted upon it. For this reason, summary judgment cannot be entered in either parties' favor on the Trust's breach of implied duty of good faith and fair dealing claim.

The Trust's more prominent theory is that the implied duty of good faith and fair dealing additionally imposed an obligation on Midland to contact the Trust through an alternative method after learning that the premium due notices sent to the Trust had been delivered.  The Trust notes that Midland could have contacted: (1) the insured at his home address which was on file in the original policy application; (2) the Trust's attorney, whose name and contact information were in Midland's files from previous correspondence in the early years of the policy; (3) the Midland agent who originally sold the policy to the Trust; or (4) Midland's Regional Sales Director in Portland.  However, for several reasons I conclude that it was not within the parties objectively reasonable expectations under the insurance policy for Midland to search out an alternative means of contact for the Trust when one of its notices was returned as undeliverable.

First, neither the express language of the contract nor the judicially implied obligation to

send premium due notices suggest an additional obligation to investigate alternative means of

contact when mailings sent to the last known address are returned as undeliverable. Second, the

parties' conduct under the contract does not suggest such a shared expectation.  The record does

not indicate that Midland established a customary practice of attempting to locate an insured

when letters to his address bounced beyond notifying an active agent or secondary addressee and

the Trust certainly never relied on Midland to go to that effort in their prior dealings with one

another.[6]  Third, the Trust cites no cases-- and I find none-- imposing an obligation on an insurer

to find an alternative mailing address or notify another individual in an attempt to reach the

insured after determining that the insured's last known is invalid.  Fourth, although the Trust's

insurance expert Mr. Lenz states that the insurance industry standard is to notify a selling agent

or Regional Sales Director when a policy is at risk of lapsing for non-payment, even the existence

of such an industry standard cannot alone create an obligation consistent with that standard.

Finally, Midland's exercise of its discretion not to affirmatively search out an alternative address

in this case does not clearly deviate from the parties' expectation that Midland would pursue its

legitimate business interests.  *See U.S. Genes v. Vial*, 143 Or. App. 552, 559, 923 P.2d 1322

(1996) (reasonable contractual expectations include "the right of either party to further its own

legitimate business interests.").  Midland has apparently made the legitimate business decision

not to expend the resources necessary to find an alternative address for insureds whose last

known addresses are found to be invalid, even though doing so will inevitably prevent Midland

from collecting further premium payments from those insureds.  In sum, the duty of good faith

and fair dealing attendant to this particular insurance contract did not obligate Midland to pursue

---

[6] This stands in stark contrast to Midland's long-standing practice of sending premium due notices, which the Trust relied upon every year as a reminder to submit its premium payments.

Page 14 - FINDINGS AND RECOMMENDATION

any of the affirmative steps suggested by the Trust to reestablish contact after determining that the Trust's address was invalid.

## CONCLUSION

For the foregoing reasons, Midland's motion for summary judgment (#95) and the Trust's informal motion for summary judgment under Fed. R. Civ. P. 56(f) contained in its response brief (#108) should both be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 24th day of October, 2012.

Honorable Paul Papak
United States Magistrate Judge